IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY,<br>      2500 Lou Menk Drive,<br>      Fort Worth, Texas, 76102<br><br>            Plaintiff,<br><br>v.<br><br>BROTHERHOOD OF LOCOMOTIVE<br>ENGINEERS AND TRAINMEN,<br>      7061 East Pleasant Valley Road,<br>      Independence, Ohio 44131<br><br>and<br><br>INTERNATIONAL ASSOCIATION OF<br>SHEET METAL, AIR, RAIL AND<br>TRANSPORTATION WORKERS –<br>TRANSPORTATION DIVISION,<br>      6060 Rockside Woods Blvd. N.,<br>      Suite 325,<br>      Independence, OH 44131<br><br>            Defendants. | § § § § § § § § § § § § § § § § § § § § § § § § § | Civil Action No. 4:26-cv-832 |

**VERIFIED COMPLAINT FOR DECLARATORY
AND EMERGENCY INJUNCTIVE RELIEF**

**Introduction**

1.     Plaintiff BNSF Railway Company ("BNSF") brings this Verified Complaint for declaratory and emergency injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, against Defendants Brotherhood of Locomotive Engineers and Trainmen ("BLET") and International Association of Sheet Metal, Air, Rail and Transportation Workers – Transportation Division ("SMART-TD") (collectively, the "Unions").  BNSF and the Unions are engaged in a disagreement concerning

1

BNSF's rights under the Enhanced Customer Service ("ECS") rule set forth in Article IX of the 1996 National Agreement with BLET and Article XI of the 1996 National Agreement with SMART-TD to implement on an experimental basis a modification to the rules that establish when engineers and conductors in pool service on the Former Montana Rail Link ("MRL") Subdivisions may be called for service following a tie up. The ECS rule was negotiated to allow railroads such as BNSF to promptly make changes to existing procedures to attract and retain customers and respond to particularized customer requests. To effectuate that purpose, it allows a carrier, upon serving notice on a union, to make changes to existing work rules for a six-month period. Should disagreement over the modification persist after that period, the matter shall be referred to arbitration.

2.      BNSF asserts that it has the contractual right to implement the proposed modification to rules that set when engineers and conductors in pool service on the Former MRL are, and are not, available to be called for service because relaxation of that rule is necessary to attract and retain customers and to respond to specific customer requests. BNSF's position that it has the right to make those changes under the ECS rule is consistent with the express language in the parties' agreements and longstanding precedent. The Unions dispute BNSF's position, pointing to substantively identical side letters to the respective National Agreements regarding the ECS rule that they assert gives them the right to thwart implementation of the proposed changes. BNSF disagrees with the Unions' interpretation of the side letters for several reasons, including that arbitral precedent refutes the Unions' ability to deprive the carrier of its contractual right to implement changes under the ECS rule prior to arbitration simply by invoking the side letter and because the Unions have not—and cannot—show that the side letter applies in this case.

3.      Given that there is plainly a disagreement over BNSF's rights *under the contract*, in the parlance of the RLA, this constitutes a "minor dispute."  Because this is a "minor dispute" under the RLA, it must be resolved through conferences between the parties and binding arbitration under Section 3 of the RLA, and a work stoppage would be unlawful.  But rather than participate in this procedure, the Unions have stated that they view this dispute as "major" and have threatened to engage in self-help—including a strike—if BNSF proceeds with implementation.  BNSF has therefore filed this Verified Complaint seeking (1) a declaration that the parties' disagreement constitutes a minor, rather than major, dispute and (2) an injunction prohibiting a strike or other self-help by the Unions over this disagreement.

## Jurisdiction and Venue

4.      This Court has jurisdiction over the subject matter of this civil action under 28 U.S.C. §§ 1331, 1337, and 1367 because this matter raises a question under the RLA, a federal law.  Federal district courts have jurisdiction to issue injunctions enforcing arbitration and compliance with the other requirements of the RLA.  *See Consol. Rail Corp. v. RLEA*, 491 U.S. 299, 303 (1989).

5.       Venue in this judicial district is proper under 28 U.S.C. § 1391(b).  BNSF is headquartered in this district, and BNSF employees represented by the Unions work in this district.

## The Parties

6.      Plaintiff BNSF is a common carrier by railroad engaged in interstate commerce and is a "carrier" within the meaning of Section 1 First of the RLA, 45 U.S.C. § 151 First.  BNSF is incorporated under the laws of the State of Delaware, and its principal place of business is 2500 Lou Menk Drive, Fort Worth, Texas 76102.  BNSF operates approximately 32,000 route miles in 28 states (including in this judicial district) and two Canadian provinces.

7.     Defendant BLET is an unincorporated association and a labor union.  BLET is a representative within the meaning of the RLA, 45 U.S.C. § 151 Sixth, and represents locomotive engineers.  By and through its officials and officers, BLET conducts business and acts for its members in this judicial district.  BLET's principal place of business is 7061 East Pleasant Valley Road, Independence, Ohio 44131.

8.     Defendant SMART-TD is an unincorporated association and a labor union.  SMART-TD is a representative within the meaning of the RLA, 45 U.S.C. § 151 Sixth, and represents conductors.  By and through its officials and officers, SMART-TD conducts business and acts for its members in this judicial district.  SMART-TD's principal place of business is 6060 Rockside Woods Blvd. N., Suite 325, Independence, Ohio 44131.

**The Parties' Agreements**

9.     BNSF is party to a variety of collective bargaining agreements with BLET and SMART-TD.  Some of the parties' collective bargaining agreements are system-wide in scope; they cover all of the employees represented by the BLET or SMART-TD, respectively, who are employed by BNSF.  Other agreements cover only a portion of the BNSF network.  There are a number of agreements that cover only those portions of the system that correspond to the properties of former railroads that have since been merged into BNSF.  BNSF is also party to a number of multi-employer agreements that are negotiated on a "national" basis with other railroads.  Typically, national agreements are negotiated by multiple railroads through a common representative, such as the National Carriers' Conference Committee ("NCCC"), which serves as the collective bargaining representative of the carriers that participate in national bargaining.  The NCCC is a division of the National Railway Labor Conference ("NRLC").  The parties' agreements also include so-called "implied terms" that have arisen through the parties' past practice.  In

4

addition, there are thousands of arbitration awards involving the carriers and unions that have interpreted and applied the terms of their agreements; those awards are considered to be part of the agreements themselves.

10.     BNSF retains all managerial rights to operate as it sees fit except to the extent it has expressly surrendered such rights through its agreements.

11.     BNSF and BLET are parties to the 1996 BLE National Agreement (Exhibit 1; Appendix ("App'x") at 1) negotiated on a multi-employer basis between the NCCC and the Brotherhood of Locomotive Engineers ("BLE") (now BLET).  Article IX of the 1996 BLE National Agreement, titled "Enhanced Customer Service," provides a framework through which individual carriers may institute, on an experimental basis, modifications to numerous types of work rules in order to attract or retain customers or to provide more efficient service in response to particularized customer requests.

12.     Article IX, Section 1(a) provides that when an individual carrier has a customer request for particularized handling that would provide more efficient service, or can show a need for relaxation of certain specific work rules to attract or retain a customer, such service may be instituted on an experimental basis for a six-month period.

13.     Article IX, Section 1(b) requires seven days' advance notice where practicable, but in no event less than forty-eight hours' advance notice, to the General Chairman.  The notice must include an explanation of the need to provide the service, a description of the service, and a description of the work rules that may require relaxation.  Section 1(b) identifies the work rules that may be relaxed: starting times, yard limits, calling rules, on/off duty points, seniority boundaries, and class of service restrictions.

14.     Article IX, Section 1(c) provides for the establishment of a Joint Committee to review Article IX proposals.  Critically, Section 1(c) further provides that if the Joint Committee has not made a determination by the end of the notice period, it is deemed deadlocked, and the "service will be allowed on an experimental basis for a six-month period."  After six months, if organization committee members continue to object, the matter is submitted to arbitration.

15.     Side Letter #9 to the 1996 BLE National Agreement confirms the parties' understanding regarding Article IX Enhanced Customer Service.  (Exhibit 2; App'x at 51.)  Side Letter #9 acknowledges that the rail freight sector had moved toward a more competitive discipline, that the parties intended to nurture improvements in service, and that enhanced focus on customer needs was an important reason underlying those improvements.  Side Letter #9 reaffirms that in Article IX of the 1996 BLE National Agreement, the parties "developed a framework for retaining existing customers and attracting new business by providing more efficient and expedient service, including relaxation of specified work rules where and to the extent necessary."

16.     Side Letter #9 contains a limited exception to the carriers' right to implement the change on a temporary basis: if the carrier's proposal under Article IX is "egregiously inconsistent" with the parties' mutual intent, the NCCC Chairman and BLET President shall promptly confer; the proposal shall be held in abeyance pending conference and not implemented until adjusted by agreement or, absent agreement, resolved by expedited, party-paid arbitration.

17.     BNSF and SMART-TD are parties to the 1996 UTU National Agreement (Exhibit 11; Appendix ("App'x") at 141) negotiated on a multi-employer basis between the NCCC and the United Transportation Union ("UTU") (now SMART-TD).  Article XI of the 1996 SMART-TD National Agreement, titled "Enhanced Customer Service," is substantively identical to Article IX

6

of the 1996 BLE National Agreement.  Side Letter #11 to the 1996 UTU National Agreement is substantively identical to Side Letter #9 to the 1996 BLE National Agreement. (Exhibit 12; App'x at 229.)

18.    In 2018, a neutral arbitrator interpreted the language in Side Letter #11 to the 1996 UTU National Agreement and Side Letter #9 to the 1996 BLE National Agreement, holding that invoking the side letter was limited to only "the most egregious of actions."  (Exhibit 3; App'x at 53.)  The arbitrator stated that the union president "should not indiscriminately use this power to thwart the Carrier's bargained for right to implement a proposal on a sixth-month trial basis." Rather "[i]ts application should be limited to those cases clearly beyond the intent of the agreement, i.e. rules not listed in the rule or application to a large unit, which could not possibly serve one customer."

19.    The ECS rule has been subject to other arbitrations as well, such as a 2003 arbitration between Union Pacific Railroad and UTU, which also addressed the carriers' right to implement on a trial basis under the national agreement.  (Exhibit 9; App'x at 103).

20.    In 2022, BLET was notified that the Montana Rail Link ("MRL"), a class II railroad, might terminate the lease it had with BNSF to operate in Montana over BNSF-owned track.  As a result, BNSF and BLET entered into an Implementing Agreement governing engineers on the Former MRL Subdivisions (the "2022 BLET Implementing Agreement") (Exhibit 4; App'x at 75.)  The 2022 BLET Implementing Agreement would only take effect if the MRL lease was actually terminated.  That lease termination took place on January 1, 2024, when BNSF began operating the rail network previously operated by the MRL.  And the 2022 BLET Implementing Agreement took effect on that same date.

21.     Section 6(D)(iii) of the 2022 BLET Implementing Agreement contains a set of "calling" rules under which engineers in pool service on the Former MRL Subdivisions have a voluntary election to take 12, 24, or 36 hours of undisturbed rest upon tie-up.  Under those rules, once an engineer in pool service covered by that agreement "ties-up"—i.e., finishes working at the end of a day—they may select whether they want to take a period of rest of 12 hours, 24 hours, or 36 hours during which they cannot be required to return to work for BNSF.  Once they make that selection, they become unavailable to be called for service by BNSF until the end of that undisturbed rest period, "with applicable call times included in such undisturbed rest periods."

22.     BNSF also entered into an Implementing Agreement with SMART-TD ("2022 SMART-TD Implementing Agreement").  (Exhibit 13; App'x at 231.)  Section 6(A)(ii)(c) of the 2022 SMART-TD Implementing Agreement contains substantively identical rules to those in Section 6(D)(iii) of the 2022 BLET Implementing Agreement.

23.     Both 2022 Implementing Agreements further state that except as otherwise provided within the agreements, the applicable local and national collective bargaining agreements between BNSF and the Unions would apply to former MRL employees covered by the Implementing Agreements.  Nothing in those Implementing Agreements, or any other agreements between the parties, state that the ECS rules set forth in the respective 1996 National Agreements will not apply to the engineers and conductors on the Former MRL Subdivisions.

24.     Section 6(D)(iii) of the 2022 BLET Implementing Agreement and Section 6(A)(ii)(c) of the 2022 SMART-TD Implementing Agreement have caused significant employee availability issues—which have resulted in significant delays, reduced reliability, and an increasing number of customer complaints.

25.     BNSF has, therefore, proposed modification of the calling rules in the 2022 Implementing Agreements pursuant to the ECS rule with a different calling procedure under which engineers and conductors in pool service that work several routes on the Former MRL Subdivisions would be provided with a consistent maximum amount of uninterrupted time off at their home terminal between working trips (24-27 hours).  This proposal, therefore, would ensure greater employee availability and predictability while continuing to provide employees with protected uninterrupted rest in excess of federal requirements.

### The Current Contract Dispute

26.     The parties are currently engaged in a dispute over whether BNSF is contractually entitled to implement changes to the calling rules for engineers and conductors in pool service on the Former MRL Subdivisions pursuant to the ECS rule or whether it must first arbitrate over that planned change.

27.     Engineers and conductors assigned to "road service"—i.e., employees that operate trains long distances between rail terminals—are generally assigned to work through a "pool." Greatly simplified, a pool is a rotating list of employees (called a "board").  When a train is ready for departure, the employee at the top of the board is called to work, and everyone else moves up one slot.  The rules regarding when and how employees may be called to perform an assignment (or when they are unavailable and cannot be called) are referred to as "calling rules."

28.     Employees in pool service operate trains from one terminal, called the home terminal, to another terminal, called the away-from-home terminal.  When the trip is finished, these employees stay overnight at the away-from-home terminal to rest.  Once they are rested, they are called to operate a train back to the home terminal.  When they return to the home terminal, employees are typically placed at the bottom of the board, waiting for their next turn.

29.    The federal Hours of Service Act limits the number of hours that operating craft employees can work and guarantees them a certain amount of time off to rest between trips. Employees may not (a) work more than twelve consecutive hours; (b) go on duty until the employee has had at least ten consecutive hours of undisturbed rest; (c) work for more than six consecutive days; or (d) work more than 276 hours in a month (something that operating craft employees rarely do regardless). In addition to those limits, employees are also guaranteed time off by agreement, such as terms regarding vacation as well as other forms of paid and unpaid personal leave.

30.    The 2022 Implementing Agreements took effect on January 1, 2024, when BNSF reestablished operations over the track formerly leased to MRL. BNSF refers to those operations as the Former MRL Subdivisions. The Former MRL Subdivisions consist of the MRLSEC, MRLTHI, MRLFOU, and MRLTEN subdivisions between Laurel, Montana and Spokane, Washington, functioning as a single continuous east-west freight corridor. This corridor is one of only two routes BNSF uses to move freight between the Pacific Northwest and the northern Great Plains. Service disruption due to crew availability issues at any one location disrupts the entire corridor.

31.    The voluntary 12/24/36-hour rest election provision in Section 6(D)(iii) of the 2022 BLET Implementing Agreement and Section 6(A)(ii)(c) of the 2022 SMART-TD Implementing Agreement are unique to the Former MRL Subdivisions and creates a significant asymmetry in crew availability compared to other regions.

32.    Since at least January 2024, BNSF has experienced severe and worsening crew-availability delays on the Former MRL Subdivisions attributable to the voluntary rest election provision. From January 1, 2024, through April 30, 2026, BNSF has documented 5,128 distinct

10

crew-availability delay events totaling 35,645 delay hours—the equivalent of 1,485 full days—on the Former MRL Subdivisions.

33.    Helena, Montana was the highest delay location with 12,640 hours and 2,202 events; Missoula, Montana was second with 9,413 hours and 1,727 events.  The MISHEL and HELLAU routes together accounted for 30,245 hours, or 84.9% of all crew-availability delay hours.

34.    BNSF's data demonstrates that 70% of tie-up events on the Former MRL Subdivisions resulted in 36-hour rest elections, compared to just 16% for 12-hour elections and 14% for 24-hour elections.  On days when 70% or more of tie-ups resulted in 36-hour rest elections, Missoula crew-availability delays averaged 18.4 hours per day versus 7.8 hours on low-rest-election days.

35.    BNSF operates 24 hours a day, 7 days a week.  BNSF's data demonstrates that 36-hour elections are also typically higher on Fridays and Saturdays compared to Tuesdays and Wednesdays, resulting in understaffing on the weekends.

36.    BNSF has sought other interim solutions to address these issues, but none have provided a durable and sustainable fix.  Moreover, when BNSF previously sought to supplement pool service operations on the Former MRL Subdivisions with "extra board" employees, BLET objected claiming that the work belonged to pool employees.

37.    BNSF's customers have experienced and documented measurable service failures resulting from these crew-availability delays.  Agtegra Cooperative ("Agtegra"), a 25-year participant in the BNSF Shuttle program, is located on the Former MRL.  It wrote to BNSF on May 14, 2026, documenting that average origin dwell for shuttle sets had increased from 32.4 hours to 65.7 hours across 11 shuttle locations over four months, and reporting facility congestion, inability to meet customer commitments, financial penalties, and additional secondary freight costs.

Agtegra expressly requested that BNSF engage on solutions to improve cycle performance. (Exhibit 5; App'x at 87.)

38.     Agtegra shuttle grain trains enter the Former MRL Subdivisions east of Laurel, Montana and are transported through Laurel-Helena, Helena-Missoula, and Missoula-Spokane territory, traversing all three pools that BNSF's proposed rule relaxation seeks to address.  Crew-availability delays on these segments have directly caused the increased origin dwell times and transit delays documented in Agtegra's May 14, 2026 letter.

39.     Signal Peak Global Markets, LLC ("Signal Peak"), operates a coal mine that is almost entirely dependent on BNSF's  trains to export its product to its customers.  Signal Peak loads coal at its facility near Laurel, Montana, with 99% of its sales volume moving via rail over the Former MRL Subdivisions to export terminals.  It wrote to BNSF on June 5, 2026, documenting quantified service failures attributable to crew unavailability.  Signal Peak reported that through April 2026 it had paid $4.6 million in vessel demurrage, that each month it loads six to eight vessels requiring six to eleven unit trains, that train delays force mine equipment idling and coal production suspensions, and that crew rest issues are a primary cause.  It further noted that these issues were causing irreparable harm to its business and requested that BNSF take action to restore reliable ratable train service.  (Exhibit 5; App'x at 88.)  Each of those customer letters is a request for improved particularized handling and more efficient service.

40.     On information and belief, if BNSF does not take prompt and immediate action to address those customer requests to fix the issues being caused by the current voluntary rest election rules, BNSF could potentially either lose the customer or its contract with the customer.

41.     In addition to the documented service failures experienced by Agtegra and Signal Peak, on information and belief, the crew-availability delays caused by Section 6(D)(iii) and

Section 6(A)(ii)(c) have impaired, and unless addressed will continue to impair, BNSF's ability to serve its customer base in and around the Former MRL. These ongoing service failures have damaged BNSF's reputation with existing customers operating in the Former MRL corridor, risk the loss of existing customer relationships, and diminish BNSF's ability to attract new customers who may instead elect to use competing railroads or alternative modes of freight transportation.

42.     On June 15, 2026, BNSF gave formal notice to BLET under Article IX, Section 1(a) and (b) of the 1996 BLE National Agreement that it intended to pursue a modification to the voluntary rest election provision in Section 6(D)(iii) of the 2022 BLET Implementing Agreement. (Exhibit 5; App'x at 81.) BNSF served a similar notice on SMART-TD the same day (Exhibit 14; App'x at 240) (collectively, the "ECS Notices").

43.     The ECS Notices were supported by the customer complaints described above, 28 months of dispatch records establishing 35,645 hours of crew-availability delay, and incentive-program data showing that the employee groups at issue had no difficulty operating with shorter rest elections.

44.     BNSF's ECS Notices proposed replacing the current voluntary 12/24/36-hour undisturbed rest election structure with a structured availability framework providing predictable rest periods aligned with corridor operational demands. The proposal would change the calling rules by eliminating the 36-hour option and establishing home cycle times of 27 hours for Missoula to Spokane, 27 hours for Missoula to Helena, and 24 hours for Laurel to Helena. Engineers may volunteer to be called for extra service before expiration of home cycle time after extra board exhaustion, may turn the option on or off at any time, and must protect calls if volunteered.

45.     The proposal affects three road pools governed by Section 6(D)(iii) and Section 6(A)(ii)(c): MIS-HEL (Boards 200/201), LAU-HEL (Boards 400/401), and MIS-SPO (Boards

13

100/101).  Customer freight moves across all three pools in sequence, so that service failures at any point become customer service failures across the entire corridor.

46.    The ECS Notices stated a proposed implementation date of June 23, 2026 and provided that if the Joint Committee had not made a determination by the end of the notice period, the matter would be deemed deadlocked under Article IX, Section 1(c) of the 1996 BLE National Agreement and Article XI, Section 1(c) of the 1996 UTU National Agreement, respectively, and BNSF would proceed with six-month trial implementation as expressly authorized by those provisions.

47.    On June 18, 2026, Kent Psota, one of BLET's General Chairmen, responded to BNSF's ECS Notice through a letter dated June 17, 2026.  (Exhibit 6; App'x at 91.)  In that letter, General Chairman Psota disputed BNSF's right to implement the proposed changes under the ECS rule, claiming that they were "egregiously inconsistent" with Article IX of the 1996 BLE National Agreement because BNSF's proposal "seeks to eliminate or materially alter a negotiated rest-election provision established through October 7, 2022, MRL Implementing Agreement" and "[i]n the Organization's view, . . . extends beyond the type of customer-specific service adjustment contemplated under Article IX and instead seeks to address broader workforce availability concerns affecting multiple pools and assignments."  General Chairmen Psota further offered several times that he was available to conference this matter.

48.    Following the Union's response, the parties scheduled a time to meet and confer over the ECS Notice on June 23, 2026.  That conference never happened.  Rather, shortly before that meeting, BLET abruptly cancelled.

49.    On June 22, 2026, BLET National President Mark L. Wallace separately wrote to NCCC Chairman Jeffrey F. Rodgers regarding the ECS Notice.  (Exhibit 7; App'x at 95.)  In that

letter, BLET acknowledged BNSF's stated intent to implement the modifications on June 23, 2026 if agreement could not be reached with the Article IX Joint Committee.

50.     In his letter, President Wallace stated that BLET had "significant concerns regarding the applicability of Article IX" and asserted that BNSF's proposal "seeks to eliminate or materially alter a negotiated rest-election provision established through the October 7, 2022 Montana Rail Link Implementing Agreement."  BLET further claimed that the proposal "extends beyond the type of customer-specific service adjustment contemplated under Article IX and addresses broader workforce availability concerns affecting multiple pools and assignments."

51.     President Wallace declared—without explanation—BNSF's proposal "egregiously inconsistent" with Article IX's mutual intent and invoked the safeguard provision of Side Letter #9.  BLET requested that the NCCC Chairman confer, and asserted that BNSF's proposal "must be held in abeyance pending conference and not implemented until adjusted by agreement or resolved by expedited party-paid arbitration."

52.     BLET further stated that if BNSF proceeded with unilateral implementation before conference and adjustment by agreement or expedited arbitration, "the Organization will consider BNSF to be engaging in self-help and would respond accordingly, which may include engaging in self-help in response" until BNSF's actions cease.  This constitutes a direct threat of a strike or other work stoppage by BLET against BNSF.

53.     On June 23, 2026, the Chairman of the NCCC responded to President Wallace to schedule a time to meet regarding BLET's objections.

54.     On June 24, 2026, BLET sent another letter in which it asserted various bases for its opposition to BNSF's proposed changes.  (Exhibit 8; App'x at 97.)

15

55.     Later on June 24, 2026, President Wallace and NCCC Chairman Rodgers held a telephonic conference to discuss the Union's objections, but were unable to resolve the disagreement.

56.     For its part, on June 17, 2026, SMART-TD General Chairman Brent Lind likewise informed BNSF that it would reach out to the union president to invoke Side Letter #11.

57.     Also on June 24, 2026,  BNSF, BLET, and SMART-TD agreed to meet in Billings, Montana, on July 7 in an effort to reach agreement on a path forward.  While BNSF made clear that it did not agree with BLET's characterization of the dispute, BNSF would withhold implementing these changes while the parties' discussions were ongoing.

58.     On July 7, 2026, BNSF representatives met with representatives of BLET and SMART-TD in Billings, Montana.  The parties were unable to resolve their dispute.  At the conclusion of that meeting, BNSF informed the Unions that it was prepared to implement its proposed rule relaxation. The Unions responded that they would consider implementation a major dispute, which means they would not refrain from engaging in a strike or other form of self-help.

59.     On July 7, 2026, BNSF responded in writing to BLET's written positions, refuting BLET's characterization of BNSF's proposal as "egregiously inconsistent" with Article IX and BLET's ability to prevent implementation of the June 15 ECS Notice on that basis.  (Exhibit 10; App'x at 135.)  Among other things, BNSF explained that: (a) Section 6(D)(iii) of the 2022 BLET Implementing Agreement is, on its face, a calling rule because it governs when an employee becomes available to be called for service following tie-up, integrating the applicable call time into the elected rest period; (b) the proposed changes are directly responsive to documented, particularized customer requests for improved service on the Former MRL Subdivisions, not to "broad manpower shortages" as the Union contended; (c) that the proposed change is narrowly

tailored to address those particularized customer requests since it would apply only to employees on three routes on the Former MRL Subdivisions which constitutes less than two percent of BNSF's approximately 32,000-route-mile system; (d) BNSF had not refused to discuss the matter, inasmuch as it was the Union that cancelled the June 23 meeting; and (e) the proposed home-rest cycles were consistent with arrangements already in effect elsewhere on the Former MRL Subdivisions.  BNSF also addressed BLET's argument based on another agreement between the parties, commonly referred to as the "Article 5/6/7" agreement.  As BNSF explained, its proposed rule relaxation does not violate that agreement for several reasons, including the fact that the 2022 BLET Implementing Agreement predates the Article 5/6/7 agreement by more than a year, the parties have never agreed that the Article 5/6/7 agreement supersedes the 2022 BLET Implementing Agreement or subjects it to the Article 5/6/7 agreement's Dispute Committee procedures, and nothing in the Article 5/6/7 agreement forecloses application of Article IX to the Former MRL Subdivisions.  In addition, without prejudice to its position that it has the contractual right to implement the proposed changes on a six-month trial basis prior to arbitration, BNSF offered to engage in expedited arbitration over whether the modifications should be maintained, rather than requiring the Union to wait until the end of the six-month trial period to submit the dispute to arbitration.  BLET has not accepted that offer.

60.     BNSF has directly asked the Unions if they considered implementation a major dispute.  BLET responded that they would use every right/action available to them.  SMART-TD responded that they concurred in BLET's response and considered implementation a major dispute.

61.     The dispute between BNSF and the Unions is a minor dispute under the RLA. BNSF's interpretation of the parties' agreements—that Article IX of the 1996 BLE National Agreement and Article XI of the 1996 UTU National Agreement give BNSF the express right to

17

institute the proposed modification on an experimental basis after providing notice, allowing the notice period to expire, and observing a deemed deadlock under Section 1(c)—is at least arguable and is not frivolous.

62.     Section 1(a) expressly authorizes institution of a work rule on an experimental basis in response to a customer request for particular handling or upon a showing of a need for relaxation of certain specific rules to attract or retain a customer.

63.     Section 1(b) sets forth various procedural steps, such as the requirement that the carrier serve notice seven days (but never less than 48 hours) in advance of the implementation date of the proposed changes.  It also states that work rules that may be relaxed under that provision "shall be limited to: starting times, yard limits, calling rules, on/off duty points, seniority boundaries, and class of service restrictions."

64.     Section 1(c) expressly provides that if the Joint Committee has not made a determination by the end of the notice period, it is deemed deadlocked and the carrier is authorized to proceed with experimental implementation for six months.  BNSF's ECS Notices provided more than seven days' notice, included the required explanations of customer need and work-rule relaxation, and identified a work rule—calling rules—expressly enumerated in Section 1(b). BNSF's contractual right to implement for six months upon deadlock is therefore facially established.

65.     BLET's invocation of Side Letter #9 and SMART-TD's invocation of Side Letter #11 do not give the Unions carte blanche to block BNSF from implementing its proposed change under the ECS rule or allow it to strike in violation of the RLA's mandatory dispute-resolution procedures over a disagreement about whether BNSF must yield its contractual right to implement upon the unsupported statement that the proposed rule is "egregiously inconsistent."  At most, the

18

Unions' "egregiously inconsistent" characterization raises additional contract-interpretation questions, including whether that side letter can be used to deprive a carrier of its right to implement changes on a six-month trial basis and if BNSF's proposal is in fact egregiously inconsistent with the mutual intent of Article IX and Article XI. These questions are themselves minor disputes, and thus subject to arbitration.

66.     BNSF's position that the Unions may not thwart the implementation allowed by Section (1)(a) of the ECS rule is at least "arguably justified." In Public Law Board No. 7907, Award No. 01, the Board interpreted the language in Side Letter #9 and Side Letter #11, and held that the narrow exception in those side letters was "only meant for the most egregious actions, such as a Carrier's attempt to relax a rule beyond the intent of Article XI" and Article IX. That is not the case here. BNSF has proposed to modify a "calling rule" to introduce more predictability into availability of pool-service employees based on documented customer complaints and 35,645 hours of crew-availability delay while retaining 24+ hours of rest for impacted employees at their home cycle. The Unions have failed to establish that this proposal is egregiously inconsistent with the mutual intent of Article IX and Article XI. As a result, BNSF's position that it may implement the rule on an experimental basis in accordance with Section (1)(a) notwithstanding the Unions' conclusory invocation of the "egregiously inconsistent" label is not frivolous. Under BNSF's interpretation of the parties' agreement, which is supported by the plain language of Article IX of the BLE agreement and Article XI of the UTU agreement, it has the right to implement its proposed change to the calling rules on the Former MRL for a six-month period prior to arbitration. That interpretation is not frivolous.

67.     Under well-established RLA jurisprudence, in minor disputes such as this, the carrier has the right to implement its interpretation of the parties' agreements pending arbitration.

68. Consistent with well-settled RLA jurisprudence, BNSF has routinely implemented its interpretation of disputed contractual terms pending the resolution of those disputes through arbitration.

69. BNSF intends to implement the changes identified in the June 15 ECS Notices on July 22, 2026. Based on the Union's statements at the July 7 meeting in Montana as well as prior correspondence, absent injunctive relief, the Unions' threatened strike or other work stoppage against BNSF could begin as soon as July 22, 2026.

70. The threatened strike over this disagreement is unlawful because BNSF's position is at least arguable and thus the dispute is minor as a matter of law.

**Balance of Harms**

71. Any work stoppage by Defendants against BNSF would cause substantial and irreparable harm to BNSF. BNSF is the nation's largest freight railroad by number of cars moved annually. It has more than 30,000 employees and operates over more than 30,000 miles of track, in twenty-eight different states. BNSF serves thousands of industrial and commercial customers, dozens of whom have no other access to rail transportation, and provides a crucial link between a number of other major freight carriers, which in turn transport cargo throughout the United States and into Canada and Mexico. Any disruption of BNSF's operations would therefore have a serious impact on interstate and international commerce.

72. Any use of self-help by the Unions could shut down BNSF's operations, deprive shippers of transportation, deprive BNSF of the use of its tracks, facilities, and revenues, threaten the safety or well-being of the general public, and put other BNSF employees out of work for the duration of the strike. In addition, any strikes or job action by the Unions will cause immediate, substantial, and lasting disruptions to BNSF's schedules, and will most likely result in delays long

after any strike is ended.  Such strikes or job actions will result in a substantial loss of business by BNSF, both during the duration of the work stoppage and during the period of lingering delays after it ends.  Moreover, delays and disruptions resulting from a strike or other self-help by the Unions will likely cause BNSF to suffer a loss of customer goodwill and future business.

73.  In addition, because BNSF interchanges traffic with other major railroads, a work stoppage by the Unions would soon disrupt the operations of other railroads, as well.  These disruptions could quickly impact rail traffic all across the country.

74.  Because of the scope of BNSF's operations, even a partial or temporary shutdown would have a drastic impact on large segments of the public and the national economy.  Thus, any strike or other self-help has the potential to interfere with the nationwide transportation of goods in interstate and international commerce.

75.  BNSF does not have an adequate remedy at law in the event of a strike or other self-help.  Only the injunctive power of this Court can compel Defendants to honor its statutory obligations to follow the RLA's dispute resolution procedures and their collective bargaining agreements with BNSF.  On information and belief, unless enjoined by this Court, Defendants will engage in the threatened unlawful work stoppage in violation of the RLA.

76.  Withholding injunctive relief from BNSF will cause far greater harm to BNSF and the general public than granting such relief will cause to Defendants.  Indeed, Defendants will suffer no harm because an injunction to follow the RLA's minor dispute procedures will merely enforce the statutory duty to comply with those procedures.  Defendants are free to pursue those procedures and submit unresolved grievances to binding arbitration before a board of adjustment pursuant to Section 3 of the RLA, which can fashion an appropriate remedy should Defendants prevail.

**COUNT I**
**(Declaratory Judgment – Both Defendants)**

77. BNSF realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1–76, above

78. A "minor dispute" under the RLA is any dispute arising out of a grievance or over the interpretation or application of the parties' collective bargaining agreements concerning rates of pay, rules, or working conditions. Such disputes are subject to conference between representatives and mandatory arbitration by specialized boards of adjustment. 45 U.S.C. §§ 152 Sixth, 153. Self-help is unlawful in the case of minor disputes, and federal courts may—and should—enjoin strikes that present or involve a minor dispute.

79. The current dispute between BNSF and the Unions over BNSF's right to implement the Enhanced Customer Service modification under Article IX of the 1996 BLE National Agreement and Article XI of the 1996 UTU National Agreement is a minor dispute because it involves the interpretation and/or application of the parties' collective bargaining agreements, including Article IX of the 1996 BLE National Agreement, Article XI of the 1996 UTU National Agreement, Side Letter #9 to the 1996 BLE National Agreement, Side Letter #11 to the 1996 UTU National Agreement, the 2022 Implementing Agreements, and related arbitral rulings. BNSF has at least an "arguable" position that it is permitted to implement the proposed modification on an experimental basis as set forth in Section 1(a) of the ECS rule upon expiration of the notice period and deemed deadlock of the Joint Committee, as expressly provided in Article IX, Section 1(c) and Article XI, Section 1(c).

80. To the extent BLET or SMART-TD takes a different view, it amounts to a dispute over the interpretation and/or application of the parties' agreements, which is a minor dispute

subject to the mandatory and exclusive procedures of Section 3 First of the RLA, 45 U.S.C. § 153 First.  BNSF is entitled to a declaratory judgment to that effect.

## COUNT II
### (Injunction Under Section 3 First of the RLA – Both Defendants)

81.    BNSF realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1–80, above.

82.    Any threatened strike, work stoppage, or other self-help by BLET or SMART-TD over the dispute alleged above is unlawful and should be enjoined under Section 3 First of the RLA, 45 U.S.C. § 153 First.

83.    In circumstances where a union and carrier disagree about the meaning or application of the parties' collective bargaining agreements, the carrier has the right to implement its interpretation pending a decision on the issue by an arbitration panel under Section 3 of the RLA, 45 U.S.C. § 153.  As a result, BNSF has the right to continue to follow its interpretation of the parties' agreements—including its right to implement the ECS modification upon deemed deadlock—without facing a strike or other forms of illegal self-help by BLET or SMART-TD.

## COUNT III
### (Injunction Under Section 2 First of the RLA – Both Defendants)

84.    BNSF realleges and incorporates by reference as if fully set forth herein the allegations of paragraphs 1–83, above.

85.    Under Section 2 First of the RLA, railroad employees and the unions that represent them have a duty to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees

23

thereof." 45 U.S.C. § 152 First. The duty imposed by Section 2 First includes a duty on the part of unions to exert every reasonable effort to ensure that their members do not engage in illegal work stoppages and/or abide by existing agreements.

86. Strikes, work stoppages, or other forms of self-help by BLET or SMART-TD against BNSF over the parties' dispute alleged above would violate the Unions' duty to "exert every reasonable effort to make and maintain agreements . . . and to settle all disputes . . . in order to avoid any interruption to commerce" under Section 2 First of the RLA, 45 U.S.C. § 152 First.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment against Defendants, and respectfully prays that the Court, as appropriate:

1. Issue a Declaratory Judgment that:

    a. The parties' current dispute over BNSF's right to implement the Enhanced Customer Service modification on the Former MRL Subdivisions is a minor dispute, not a major dispute, within the meaning of the RLA that is subject to compulsory arbitration pursuant to Section 3 of the RLA, 45 U.S.C. § 153 First; and

    b. Defendants may not lawfully strike, picket, engage in a work stoppage, sick out, or slowdown, threaten to do so, or otherwise exercise coercive self-help against Plaintiff, its operating rail subsidiaries and/or affiliates, or encourage others to do so as a result of the parties' present dispute

2. Issue injunctive relief that:

    a. Enjoins BLET and SMART-TD, their officers, divisions, members, agents, and all persons acting in concert with them from calling, encouraging, or otherwise engaging in striking, picketing, engaging in a work stoppage, sick out, or slowdown,

24

refusing work, or otherwise exercising coercive self-help against Plaintiff, its subsidiaries and/or affiliates, or encouraging others to do so; and

b. Grants any appropriate preliminary injunctive relief against Defendants.

3. Award Plaintiff its costs and expenses incurred in this proceeding; and grant damages and such other and further relief as the Court deems just and proper.

Dated: July 8, 2026

Respectfully submitted,

*/s/ Russell D. Cawyer*
Russell D. Cawyer (State Bar No. 00793482)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Tel.: (817) 332-2500
Fax: (817) 335-2820
Email:  russell.cawyer@kellyhart.com

Aaron S. Markel*
JONES DAY
150 West Jefferson Ave., Suite 2100
Detroit, Michigan 48226
Telephone: (313) 230-7929
Facsimile: (202) 626-1700
Email: amarkel@jonesday.com

Koree B. Wooley*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121
Telephone: (858) 314-1191
Facsimile: (844) 345-3178
Email: kbwooley@jonesday.com

*Attorneys for Plaintiff*
*BNSF Railway Company*

* application to appear *pro hac vice* forthcoming

25

## **VERIFICATION**

I, Melissa Beasley Coke, certify under penalty of perjury that I am the Assistant Vice President Labor Relations for BNSF Railway Company, that I am familiar with the matters stated in the foregoing Verified Complaint, and that the facts stated therein are true.

Executed on July 8th, 2026 in Fort Worth, Texas.

Melissa Beasley Coke

_____

Melissa Beasley Coke