69IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:26-cv-00832-P |
| | § | |
| BROTHERHOOD OF LOCOMOTIVE | § | |
| ENGINEERS & TRAINMEN, AND | § | |
| INTERNATIONAL ASSOCIATION OF | § | |
| SHEET METAL, AIR, RAIL AND | § | |
| TRANSPORTATION WORKERS, | § | |
| TRANSPORTATION DIVISION, | § | |
| | | |
| Defendants. | | |

**DEFENDANT INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL
AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION'S ANSWER
AND VERIFIED COUNTERCLAIM FOR DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF UNDER THE RAILWAY LABOR ACT**

Pursuant to Fed. R. Civ. P. 15(a)(1), Defendant/Counterclaimant the International

Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division

("SMART-TD" or "the Union") presents the following as its Answer and Verified Counterclaim.

**Introduction**

1.    The allegations contained in Paragraph 1 merely set forth the relief sought by

BNSF in this matter. SMART-TD specifically denies that BNSF is entitled to any relief

requested. To the extent the allegations are directed to the Brotherhood of Locomotive Engineers

& Trainmen ("BLET"), they warrant no response from SMART-TD. Any and all other

allegations contained in Paragraph 1 are denied. SMART-TD specifically denies BNSF's

characterization of its rights under Article XI of the National Agreement as it pertains to

Enhanced Customer Service ("ECS") and avers that Article XI and Side Letter No. 11 speak for

1

themselves. SMART-TD avers that Section 2 First of the Railway Labor Act ("RLA" or "the Act") imposes an affirmative obligation on BNSF to exert every reasonable effort to make and maintain agreements, and prohibits carriers from engaging in self-help prior to exhausting the Act's process for "major" disputes. SMART-TD further avers that BNSF is prohibited from implementing a modification pending arbitration where the SMART-TD President has deemed the modification egregiously inconsistent with Article XI.

2.     With respect to the allegations contained in Paragraph 2, SMART-TD admits that BNSF has asserted a contractual right to make changes with respect to when conductors may be called for service. SMART-TD further admits that such unilateral action is forbidden by the terms of the side letter referenced in Paragraph 2, which speaks for itself. SMART-TD denies the remaining allegations contained in Paragraph 2.

3.     With respect to the allegations contained in Paragraph 3, SMART-TD admits that it considers the present dispute between the parties to be a major dispute under the RLA. SMART-TD further admits that BNSF has sought declaratory and injunctive relief. SMART-TD denies the remaining allegations in Paragraph 3. SMART-TD specifically denies that it has threatened to engage in self-help of any kind, including a strike.

### Jurisdiction and Venue

4.     SMART-TD admits that federal courts have jurisdiction to issue injunctions enforcing arbitration and other requirements of the RLA.  SMART-TD denies that BNSF's requested injunction is warranted.

5.     SMART-TD admits the allegations contained in Paragraph 5.

### The Parties

6.     SMART-TD admits the allegations contained in Paragraph 6.

7. The allegations contained in Paragraph 7 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD admits the allegations contained in Paragraph 7.

8. SMART-TD admits the allegations contained in Paragraph 8.

### The Parties' Agreements

9. With regard to the allegations contained in Paragraph 9, SMART-TD admits that it is party to collective bargaining agreements with BNSF that can be local, system-wide, or national in scope. SMART-TD further admits that agreements may include implied terms as a result of past practice, and there are arbitration awards that interpret and apply agreement provisions. SMART-TD avers that no agreement terms, express or implied, or arbitral decisions, permit BNSF's planned unilateral actions at issue here. Any and all other allegations are denied.

10. SMART-TD denies the allegations contained in Paragraph 10.

11. The allegations contained in Paragraph 11 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

12. The allegations contained in Paragraph 12 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein and they are therefore denied.

13. The allegations contained in Paragraph 13 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required,

SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

14. The allegations contained in Paragraph 14 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

15. The allegations contained in Paragraph 15 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

16. The allegations contained in Paragraph 16 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

17. With respect to the allegations contained in Paragraph 17, SMART-TD admits that it is a party to the 1996 UTU National Agreement between the NCCC and UTU (now SMART-TD), and avers that that document, including Side Letter #11, speaks for itself. The remaining allegations appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD avers that such documents speak for themselves. Any and all remaining allegations are denied.

18. The allegations contained in Paragraph 18 refer to an arbitration agreement, which speaks for itself. SMART-TD avers that Side Letter #11 explicitly prohibits carriers, including BNSF, from implementing their proposal on a trial basis where the SMART-TD President has

determined, in his sole discretion, that such implementation is egregiously inconsistent with Article XI. SMART-TD further avers that the award referenced recognizes that the carrier was prohibited from implementing its proposal on a trial basis in that case.

19. The allegations contained in Paragraph 19 refer to an arbitration agreement, which speaks for itself. SMART-TD further avers that Side Letter #11 explicitly prohibits carriers, including BNSF, from implementing their proposal on a trial basis where the SMART-TD President has determined, in his sole discretion, that such implementation is egregiously inconsistent with Article XI. SMART-TD further avers that the award referenced recognizes that the carrier was prohibited from implementing its proposal on a trial basis in that case.

20. The allegations contained in Paragraph 20 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD only admits that the Montana Rail Link ("MRL") lease terminated effective January 1, 2024, and that BNSF began operating the trackage previously operated by the MRL. SMART-TD is without sufficient information to aver to the remaining allegations contained therein, and they are therefore denied.

21. The allegations contained in Paragraph 21 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

22. With regard to the allegations contained in Paragraph 22, SMART-TD admits that it entered into an implementing agreement with BNSF in 2022, and avers that such document speaks for itself. Any and all other remaining allegations are denied.

23.    To the extent allegations contained in Paragraph 23 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied. To the extent the remaining allegations are directed to SMART-TD, such refer to the 2022 SMART-TD Implementing Agreement, which speaks for itself. Any and all allegations are denied.

24.    To the extent allegations contained in Paragraph 24 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied. To the extent the remaining allegations are directed to SMART-TD, they are denied. SMART-TD avers that its 2022 implementing agreement was voluntarily entered into by both BNSF and SMART-TD. SMART-TD further avers that any alleged manpower shortage at BNSF pertains solely to its failure to properly hire and staff its operations, which is a long-standing issue.

25.    With respect to the allegations contained in Paragraph 25, SMART-TD only admits that BNSF has stated its intent to implement a unilateral modification to the voluntary rest election provision set forth in Section 6(D)(iii) of the October 7, 2022 Implementing Agreement between BNSF and SMART-TD governing the former MRL Subdivisions purportedly under Article XI, Section 1(a) and (b) of the 1996 National Agreement. SMART-TD denies the remaining allegations contained in Paragraph 25. SMART-TD specifically denies that BNSF has any authority to make such modifications under any agreement with SMART-TD.

**The Current Contract Dispute**

26.    SMART-TD denies the allegations contained in Paragraph 26.

6

27.     SMART-TD admits the allegations contained in Paragraph 27, but denies that the present matter involves a dispute over calling rules.

28.     With regard to the allegations contained in Paragraph 28, SMART-TD admits the allegations contained therein, but avers that they have no relevance to the matter at hand.

29.     SMART-TD admits the allegations contained in Paragraph 29.

30.     With respect to the allegations contained in Paragraph 30, SMART-TD admits that the 2022 implementing agreement between SMART-TD and BNSF went into effect when BNSF resumed control of track formerly leased to MRL. SMART-TD further admits that BNSF refers to the former MRL subdivisions as MRLSEC, MRLTHI, MRLFOU, and MRLTED. SMART-TD is without sufficient information to aver to the remaining allegations, and they are therefore denied.

31.     To the extent the allegations contained in Paragraph 31 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied. SMART-TD denies the remaining allegations contained in Paragraph 31. SMART-TD avers that the 2022 implementing agreement was voluntarily entered into by BNSF and SMART-TD. SMART-TD further avers that any crew availability asymmetry is a result of BNSF's failure to properly staff its operations, which is a long-standing issue.

32.     With respect to the allegations contained in Paragraph 32, SMART-TD only admits that BNSF has experienced delays due to crew availability. SMART-TD denies the remaining allegations contained in Paragraph 32. SMART-TD avers that any crew availability issues are the result of BNSF's failure to properly staff its operations, which is a long-standing issue.

33.     SMART-TD is without sufficient information to aver as to the allegations contained in Paragraph 33, and they are therefore denied.

34.     SMART-TD is without sufficient information to aver as to the allegations contained in Paragraph 34, and they are therefore denied.

35.     With respect to the allegations contained in Paragraph 35, SMART-TD admits that BNSF operates 24 hours a day, 7 days a week. SMART-TD is without sufficient information to aver as to the remaining allegations contained therein, and they are therefore denied.

36.     With regard to the allegations contained in the first sentence of Paragraph 36, SMART-TD only admits that BNSF offered some monetary incentives to employees, but avers that these incentives did not resolve the underlying issue of BNSF's failure to appropriately staff the territory to operate trains. To the extent allegations contained in Paragraph 36 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

37.     To the extent the allegations contained in Paragraph 37 refer to a letter dated May 14, 2026, such speaks for itself. SMART-TD avers that Agtegra grain trains traverse the former MRL territory after entering east of Laurel, Montana, like numerous other westbound trains operating from elsewhere on the BNSF system. SMART-TD further avers that Agtegra has no facilities located on the former MRL property, and those trains neither originate nor terminate on that territory.  Any and all other allegations are denied.

38.     To the extent the allegations contained in Paragraph 38 refer to a letter dated May 14, 2026, such speaks for itself. SMART-TD avers that Agtegra grain trains traverse the former MRL territory after entering east of Laurel, Montana, like numerous other westbound trains

operating from elsewhere on the BNSF system. SMART-TD further avers that Agtegra has no facilities located on the former MRL property, and those trains neither originate nor terminate on that territory. Any and all other allegations are denied.

39.  To the extent the allegations contained in Paragraph 39 refer to a letter dated June 5, 2026, such speaks for itself. SMART-TD is without sufficient information to aver as to the remaining allegations contained in Paragraph 39, and for that reason, they are denied. SMART-TD further avers that Signal Peak has no facilities located on the former MRL property, and those trains neither originate nor terminate on that territory. Any and all other allegations are denied.

40.  The allegations contained in Paragraph 40 are mere speculation and warrant no response from SMART-TD. To the extent a response is required, SMART-TD denies the allegations contained in Paragraph 40.

41.  The allegations contained in Paragraph 41 reflect mere speculation and warrant no response from SMART-TD. To the extent a response is required, SMART-TD denies the allegations contained in Paragraph 41.

42.  SMART-TD admits that BNSF served a notice on June 15, 2026, on SMART-TD of its intent to modify the parties' voluntary rest provisions. To the extent the remaining allegations contained in Paragraph 42 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

43.  SMART-TD is without sufficient information to aver to the information contained in Paragraph 43, and for that reason, they are denied.

44. To the extent the allegations contained in Paragraph 44 are directed to BLET, they require no response from SMART-TD. To the extent a response is required, the allegations are denied. Any and all other allegations are hereby denied.

45. With regard to the allegations contained in Paragraph 45, SMART-TD only admits that BNSF's proposal affects three road pools. SMART-TD denies the remaining allegations contained therein.

46. To the extent the allegations contained in Paragraph 46 reference the ECS notices and 1996 National Agreements, such documents speak for themselves. The remaining allegations contained in Paragraph 46 are denied.

47. The allegations contained in Paragraph 47 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

48. The allegations contained in Paragraph 48 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

49. To the extent allegations contained in Paragraph 49 relate to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and they are therefore denied.

50. The allegations contained in Paragraph 50 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required,

SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

51. The allegations contained in Paragraph 51 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

52. The allegations contained in Paragraph 52 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

53. The allegations contained in Paragraph 53 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

54. The allegations contained in Paragraph 54 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

55. The allegations contained in Paragraph 55 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

56. SMART-TD admits the allegations contained in Paragraph 56.

57.     SMART-TD admits the allegations contained in the first sentence of Paragraph 57 The remaining allegations appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

58.     With regard to the allegations contained in Paragraph 58, SMART-TD admits that the parties met on July 7, 2026, and were unable to resolve the dispute, and that BNSF stated that it was prepared to unilaterally implement its proposed changes. SMART-TD denies that SMART-TD GO-001 General Chairperson Lind took the position that he considered the matter to constitute a major dispute under the RLA, and further denies that stating a dispute is major constitutes a threat to engage in a strike, self-help, or any other unlawful conduct. SMART-TD further denies any allegation that General Chairperson Lind or any other SMART-TD officer in any way threatened to engage in any strike, self-help, or unlawful conduct. Any and all remaining allegations are denied.

59.     The allegations contained in Paragraph 59 appear to be directed to the BLET, and as such, do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied.

60.     To the extent the allegations contained in Paragraph 60 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied. With regard to the remaining allegations, SMART-TD denies that it communicated any position that they considered the dispute to constitute a major dispute under

12

the RLA at that time, and further denies that stating a dispute is major constitutes a threat to engage in a strike, self-help, or any other unlawful conduct. Any and all remaining allegations are denied. SMART-TD specifically denies any allegation that it threatened to engage in any strike or other form of self-help. SMART-TD avers that BNSF has a repeated pattern of seeking legal intervention when SMART-TD declines to acquiesce to BNSF's position regarding the nature of a dispute. Any and all remaining allegations are denied.

61.    To the extent that the allegations contained in Paragraph 61 contain legal conclusions, no response is required. To the extent a response is required, SMART-TD denies the allegations contained therein. To the extent the remaining allegations refer to the National Agreements, such documents speak for themselves. Any and all other allegations are denied.

62.    To the extent that the allegations contained in Paragraph 62 contain legal conclusions, no response is required. To the extent a response is required, SMART-TD denies the allegations contained therein. To the extent the remaining allegations refer to a provision in the National Agreement, such documents speak for themselves. Any and all other allegations are denied. SMART-TD further avers that BNSF is prohibited from implementing a modification pending conference and arbitration where the SMART-TD President has deemed the modification egregiously inconsistent with Article XI.

63.    To the extent that the allegations contained in Paragraph 63 contain legal conclusions, no response is required. To the extent a response is required, SMART-TD denies the allegations contained therein. To the extent the remaining allegations refer to a provision in the National Agreement, such documents speak for themselves. Any and all other allegations are denied. SMART-TD further avers that BNSF is prohibited from implementing a modification

13

pending conference and arbitration where the SMART-TD President has deemed the modification egregiously inconsistent with Article XI.

64.    To the extent that the allegations contained in Paragraph 64 contain legal conclusions, no response is required. To the extent a response is required, SMART-TD denies the allegations contained therein. To the extent the remaining allegations refer to a provision in the National Agreement, such documents speak for themselves. Any and all other allegations are denied. SMART-TD further avers that BNSF is prohibited from implementing a modification pending conference and arbitration where the SMART-TD President has deemed the modification egregiously inconsistent with Article XI.

65.    To the extent allegations contained in Paragraph 65 are directed to the BLET, such do not warrant a response from SMART-TD. To the extent a response is required, SMART-TD is without sufficient information to aver to the allegations contained therein, and for that reason, they are denied. To the extent the allegations contained in Paragraph 65 consist of legal conclusions or argument and are not factual, SMART-TD denies said allegations. SMART-TD denies the remaining allegations contained in Paragraph 65. SMART-TD specifically denies BNSF's categorization of the present dispute as minor.

66.    To the extent the allegations contained in Paragraph 66 consist of legal conclusions or argument and are not factual, SMART-TD denies said allegations. SMART-TD denies the remaining allegations contained in Paragraph 66. SMART-TD specifically denies that BNSF's argument is not frivolous.

67.    To the extent the allegations contained in Paragraph 67 consist of legal conclusions, they require no response from SMART-TD. Any and all remaining allegations are denied. SMART-TD specifically denies that the present dispute is minor.

68.     To the extent the allegations contained in Paragraph 68 consist of legal conclusions, they require no response from SMART-TD. To the extent the allegations refer to unidentified judicial decisions, such decisions speak for themselves. Any and all other allegations are denied. SMART-TD avers that the present dispute is major under the RLA, and further avers that, pursuant to the express terms of Side Letter No. 11 to the 1996 National Agreement, BNSF is prohibited from implementing its proposed changes unless and until the procedures prescribed therein, including expedited arbitration, if necessary, have been completed.

69.     On information and belief, SMART-TD admits that BNSF intends to implement its unilateral changes on July 22, 2026. SMART-TD denies that it threatened to strike or engage in any other form of self-help. Any and all other allegations are denied.

70.     The allegations contained in Paragraph 70 consist of legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

### Balance of Harms

71.     The allegations contained in Paragraph 71 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

72.     The allegations contained in Paragraph 72 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is

required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

73.     The allegations contained in Paragraph 73 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

74.     The allegations contained in Paragraph 74 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

75.     The allegations contained in Paragraph 75 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

76.     The allegations contained in Paragraph 76 consist of argument and legal conclusions, and therefore require no response from SMART-TD. To the extent a response is required, the allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

## COUNT I

### (Declaratory Judgment – Both Defendants)

77.     The allegations contained in Paragraph 77 merely reassert the allegations contained in Paragraphs 1-76. As these allegations have already been responded to above, no further response is necessary here.

78.     To the extent the allegations contained in Paragraph 78 consist of legal conclusions, they require no response from SMART-TD. Any and all remaining allegations are denied. SMART-TD specifically denies that the present dispute is minor, and specifically denies that it has threatened to strike or engage in any self-help.

79.     The allegations contained in Paragraph 79 contain conclusions of law, to which no response is required. To the extent a response is deemed necessary, they are hereby denied. SMART-TD specifically denies that BNSF's position is arguable, but rather is frivolous based upon the plain language of Side Letter No. 11. SMART-TD further specifically denies that the disputes are minor and that the Railroads are entitled to any relief whatsoever.

80.     The allegations contained in Paragraph 79 contain conclusions of law, to which no response is required. To the extent a response is deemed necessary, they are hereby denied. SMART-TD specifically denies that BNSF's position is arguable, but rather is frivolous based upon the plain language Side Letter No. 11, which expressly prohibits BNSF from implementing its proposed changes unless and until the procedures prescribed therein, including expedited arbitration, if necessary, have been completed. SMART-TD further specifically denies that the disputes are minor and that the Railroads are entitled to any relief whatsoever.

## COUNT II

### (Injunction Under Section 3 First of the RLA – Both Defendants)

81.     The allegations contained in Paragraph 81 merely reassert the allegations contained in Paragraphs 1-80. As these allegations have already been responded to above, no further response is necessary here.

82.     To the extent the allegations contained in Paragraph 82 consist of legal conclusions, they require no response from SMART-TD. Any and all remaining allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

83.     To the extent the allegations contained in Paragraph 83 consist of legal conclusions, they require no response from SMART-TD. Any and all remaining allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

## COUNT II

### (Injunction Under Section 3 First of the RLA – Both Defendants)

84.     The allegations contained in Paragraph 84 merely reassert the allegations contained in Paragraphs 1-83. As these allegations have already been responded to above, no further response is necessary here.

85.     With regard to the allegations contained in Paragraph 85, SMART-TD admits that BNSF selectively quotes a portion of Section 2 First of the RLA, which speaks for itself. SMART-TD avers, however, that Section 2 First imposes reciprocal obligations upon both carriers and labor organizations, not solely employees and their representatives. SMART-TD further avers that it has complied with those obligations and that BNSF, by attempting to unilaterally implement its proposed changes, has failed to do so here. Any and all remaining allegations are denied.

86.     To the extent the allegations contained in Paragraph 86 consist of legal conclusions, they require no response from SMART-TD. Any and all remaining allegations are denied. SMART-TD specifically denies that it has threatened to strike or engage in any self-help.

To the extent not specifically admitted to above, any and all allegations are hereby denied.

18

With regard to BNSF's Prayer, SMART-TD denies that the Carrier is entitled to any of the relief sought. SMART-TD specifically denies that BNSF is entitled to declaratory and injunctive relief enjoining SMART-TD from exercising self-help.

## AFFIRMATIVE AND OTHER DEFENSES

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted as to SMART-TD.

### SECOND DEFENSE

SMART-TD has not made any strike threat.

### THIRD DEFENSE

The Court is without jurisdiction to grant injunctive relief herein by virtue of the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101, *et seq*. Plaintiff failed to comply with the obligations imposed by law prior to unilaterally instituting major changes in working conditions involved in this labor dispute, has failed to exhaust the available governmental machinery of mediation through the National Mediation Board ("NMB"), has failed to comply with the status quo provisions of Sections 2 Seventh and 6 of the RLA, 45 U.S.C. §§ 152 Seventh, 156, and has failed to comply with its duty to exert every reasonable effort to make and maintain agreements under Section 2 First of the RLA, 45 U.S.C. § 152, First, and is therefore precluded by the provisions of the Norris-La Guardia Act, and particularly Section 8 thereof, 29 U.S.C. § 108, from obtaining the relief sought herein or any injunctive relief.

### FOURTH DEFENSE

The underlying dispute is properly characterized as a "major dispute" under Sections 2 and 6 of the RLA, 45 U.S.C. §§ 152 and 156.

19

**WHEREFORE,** having fully answered the Complaint in its entirety, Defendant prays that the relief requested be denied and that the Complaint be dismissed, and that Defendant may have its costs herein, reasonable attorneys' fees incurred, and such other and further relief as the Court may deem appropriate.

## VERIFIED COUNTERCLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE RAILWAY LABOR ACT

Defendants/Counterclaimant SMART-TD seeks declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and injunctive relief against Defendant BNSF.

## JURISDICTION AND VENUE

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1337 (Act regulating commerce, *viz.*, the Railway Labor Act, 45 U.S.C. § 151, *et seq.*), and 2201 (declaratory judgments).

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b) and (c) because BNSF operates through this judicial district, and because BNSF is subject to personal jurisdiction here.

## PARTIES

3.      Plaintiff SMART-TD, formerly United Transportation Union, is the duly authorized representative for the purposes of the Railway Labor Act ("RLA" or "the Act") of the crafts or classes of train service employees, including Conductors, employed by BNSF, and is a "representative" as defined by Section 1 Sixth of the RLA, 45 U.S.C. § 151 Sixth.  SMART-TD is located at 6060 Rockside Woods Blvd., Ste. 325, Independence, OH 44131.

4.      Defendant BNSF is a carrier by rail as defined in the ICC Termination Act, 49 U.S.C. § 10102, and a carrier as defined in Section 1 First of the RLA, 45 U.S.C. § 151, First.

20

BNSF is headquartered at 2600 Lou Menk Drive, Fort Worth, Texas, and operates within this judicial district.

## CLAIM FOR RELIEF

### Collective Bargaining under the Railway Labor Act

5.      Collective bargaining between railroads and their employees' representatives over rates of pay, rules and working conditions is governed by the RLA. Collective bargaining agreements thereunder are amended through the service of written notice of intended changes in agreements affecting rates of pay, rules or working conditions, pursuant to Section 6 of the RLA, 45 U.S.C. § 156. Such proposals, called "Section 6 Notices," are negotiated in conferences between representatives designated and authorized by the carrier or carriers, and by the collective bargaining representative(s) of their employees. 45 U.S.C. §§ 152 Second, 156. If conferences fail, the dispute is subject to mediation by the National Mediation Board ("NMB"). 45 U.S.C. § 155 First. If mediation fails, the President of the United States may appoint a Presidential Emergency Board ("PEB") to investigate and issue recommendations for settlement of the dispute. 45 U.S.C. § 160. Until these procedures are exhausted, and for thirty days thereafter, parties must maintain the status quo established by existing agreements. 45 U.S.C. §§ 152 First, 152 Seventh, 156, 160.

### The Status Quo Requirement under the Railway Labor Act

6.      Pursuant to § 2 First, 45 U.S.C. § 152 First, the Act requires that the parties make and maintain agreements. As noted, the Act also provides very specific and mandatory procedures for how agreements can be changed or modified. Until these procedures are exhausted, and for thirty days thereafter, parties must maintain the status quo established by existing agreements. 45 U.S.C. §§ 152 First, 152 Seventh, 156, 160.

7.      Section 2 First of the RLA, provides:

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to <u>make and maintain agreements concerning rates of pay, rules, and working conditions</u>, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First (emphasis added).

8.      Furthermore, the RLA mandates a very specific procedure to change working conditions. Section 6 of the RLA, provides:

> Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within the thirty days provided in the notice.

45 U.S.C. § 156.

9.      Taken together, these sections of the RLA require carriers to maintain the status quo with respect to rates of pay, rules, and working conditions until the mandatory notice, negotiation, and mediation procedures of the Act are completed.

10.      Federal courts are empowered to issue injunctions to stop unilateral action by a rail carrier during this process of resolution.

### The Controlling Agreement at Issue

11.      SMART-TD and BNSF are parties to several agreements that control and detail the terms and conditions of employment for the class and/or craft of train service employees represented by SMART-TD, and also to various work practices which have become an integral and implicit part of those agreements though not set forth therein.

12.      Collective bargaining in the railroad industry occurs both at the national and local levels. In national bargaining, commonly referred to as "national handling," participating rail

22

carriers negotiate collectively through the National Carriers' Conference Committee ("NCCC"), while the national railroad unions negotiate through their respective national negotiating committees. National handling negotiations result in "national agreements," which are CBAs between the railroads participating in national handling and the various unions representing their employees. At all relevant times, BNSF participated in national bargaining through the NCCC, its authorized bargaining representative. By contrast, local agreements are negotiated "on the property," that is, locally between an individual carrier and the union's appropriate General Committee of Adjustment ("GCA"), and govern rates of pay, work rules, or any other item the parties mutually agree to that are applicable to that carrier or a portion thereof.

13.     As is relevant here, on September 26, 1996, the NCCC and the United Transportation Union ("UTU"), SMART-TD's predecessor, entered into the 1996 National Agreement which remains in effect between the carriers represented by the NCCC, including BNSF, except as subsequently modified. A true and correct copy of the pertinent provisions of the 1996 National Agreement are attached hereto as Exhibit ("Ex") A.

14.     Article XI of the 1996 National Agreement, entitled "Enhanced Customer Service" ("ECS"), establishes a limited procedure under which a signatory carrier may, under specified circumstances, temporarily relax certain enumerated work rules when necessary to respond to a particular customer's request for service or to attract or retain business. (Ex. A. at 2-3). In exchange for the carriers' receipt of this extraordinary benefit, the parties simultaneously negotiated Side Letter No. 11, which contains an express limitation that unambiguously requires a carrier's proposal to be held in abeyance pending conference and until adjusted by the parties

23

or resolved by expedited arbitration where a carrier's proposal is egregiously inconsistent with

Article XI. (Ex. A at 4-5). Indeed, it states, in pertinent part:

> In Article XI, we have developed a framework for achieving our mutual goal of retaining existing customers and attracting new business by providing more efficient and expedient service, including relaxation of work rules specified therein where and to the extent necessary for those purposes. We are also in accord that these undertakings should appropriately recognize the interests of affected employees in fair and equitable working conditions.
>
> This will confirm our understanding that the NCCC Chairman and the UTU President shall promptly confer on any carrier proposal under Article XI that the UTU President deems to be egregiously inconsistent with our mutual intent. Such proposal shall be held in abeyance pending conference and shall **not** be implemented until adjusted by agreement of the parties or, absent such agreement, resolved by expedited, party paid arbitration as set forth in the attachment hereto.

(Ex. A at 4) (emphasis added).

15.     Since the execution of the 1996 National Agreement nearly thirty years ago, no participating carrier has implemented an Article XI proposal after the SMART-TD President or his predecessor invoked the procedures prescribed by Side Letter No. 11. On at least two prior occasions, despite disputing whether their respective proposals were "egregiously inconsistent" with the parties' mutual intent, the carriers nevertheless participated in the conference and expedited arbitration procedures prescribed by Side Letter No. 11 before implementing their proposals. True and correct copies of the resulting arbitration awards are attached as Exhibits E and F.

### The Present Situation

16.     On or about October 7, 2022, BNSF and SMART-TD entered into an Implementing Agreement governing the transition of operations following the termination of Montana Rail Link's ("MRL") lease of certain BNSF rail lines, effective January 1, 2024. A true and correct copy of the Implementing Agreement is attached hereto as Exhibit B. Before BNSF

24

resumed operations over the former MRL property, BLET represented the operating employees, including train service employees whom BLET referred to as "Assistant Engineers." For approximately five years before BNSF resumed operations, those employees had been subject to voluntary home-terminal rest elections. Among the negotiated provisions of the Implementing Agreement, Section 6(A)(ii)(C) preserved employees' right to those elections, and states:

> Trainmen in pool service may request, upon tie up, undisturbed rest of twelve (12) hours, twenty-four (24) hours, or thirty-six (36) hours with applicable call times included in such undisturbed rest periods. Such election shall be made by the trainman upon tie-up. If no election is made, the default shall be twenty-four (24) hours.

(Ex. B at 4).

17.    On June 15, 2026, BNSF served SMART-TD with a notice citing Article XI of the 1996 National Agreement which proposed to change the negotiated voluntary rest-election provisions in Section 6(A)(ii)(C) of the parties' 2002 Implementing Agreement. A true and correct copy of BNSF's notice is attached hereto as Exhibit C.

18.    Representatives from BNSF and SMART-TD General Committee of Adjustment GO-001 met on June 24 in St. Paul, Minnesota, and again on July 7, 2026, in Billings, Montana, in an effort to resolve the matter. During those meetings, SMART-TD GO-001 proposed various alternatives intended to address BNSF's stated operational concerns while preserving the parties' negotiated agreements. Despite those efforts, the parties were unable to reach agreement.

19.    Following the conclusion of the July 7, 2026, meeting, BNSF AVP Labor Relations Melissa Beasley inquired how SMART-TD would respond if BNSF unilaterally imposed the conditions of the ECS notice. General Chairperson Lind agreed with BLET representatives that such would be improper and that they would use all lawful means to oppose it. At no time did he, nor anyone from SMART-TD, engage in any threats of self-help.

25

20.     When the parties were unable to resolve the matter, by letter dated July 8, 2026, SMART-TD President Jeremy R. Ferguson advised NCCC Chairperson Jeff Rodgers that he had determined BNSF's proposal to be egregiously inconsistent with the parties' mutual intent underlying Article XI and invoked the procedures prescribed by Side Letter No. 11. President Ferguson further advised that pursuant to the express terms of Side Letter No. 11, BNSF's proposal "shall be held in abeyance" pending completion of the conference and, absent agreement, expedited arbitration. A true and correct copy of the July 8, 2026, letter is attached hereto as Exhibit D.

21.     On July 10, 2026, NCCC Chairperson Rodgers responded to SMART-TD President Ferguson regarding scheduling the conference for the afternoon of July 14, 2026. The parties have since confirmed that the conference will take place on that date. Nevertheless, and notwithstanding the express prohibition in Side Letter No. 11, BNSF has announced its intention to implement its proposal before completion of the required process, and on July 8, 2026, commenced this action. Later that same day, BNSF moved for a temporary restraining order and/or preliminary injunction to enjoin SMART-TD from engaging in self-help with respect to the present dispute.

**<u>SMART-TD's Claim for Declaratory and Injunctive Relief</u>**

22.     SMART-TD realleges and incorporates by reference the foregoing paragraphs as though fully set forth herein.

23.     Despite the Union's best efforts to resolve the matter, BNSF has refused to abide by the plain terms of Article XI and Side Letter 11 of the 1996 National Agreement and announced its intention to unilaterally implement the changes proposed in its June 15, 2026, notice.

26

24.     BNSF's proposed justification for its unilateral action is frivolous.

25.     By its actions set forth above, BNSF is violating its obligation to make and maintain agreements as required by Section 2 First and Section 6 of the RLA, 45 U.S.C. §§ 152 First, 156, and has violated the status quo requirements, entitling SMART-TD to declaratory and injunctive relief.

26.     By its actions set forth above, BNSF has failed to negotiate changes and maintain the status quo during such period in violation of Section 2 First and Section 6 of the RLA, 45 U.S.C. §§ 152 First, 156, entitling SMART-TD to a status quo injunction.

**WHEREFORE,** SMART-TD requests that this Court:

A.     Issue a Declaratory Judgment that BNSF's actions unlawfully change the status quo and violate the Carrier's obligations under the RLA;

B.     Bar BNSF from implementing the changes proposed in its June 15, 2026, notice;

C.     Issue injunctive relief enjoining Defendant BNSF, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with it from implementing its June 15, 2026, proposal;

D.     Award SMART-TD its costs and attorney's fees incurred in this proceeding; and

E.     Grant SMART-TD such other and further relief as the Court deems just and proper.

Dated: July 10, 2026

Respectfully Submitted:

*/s/ Sanford R. Denison*
SANFORD R. DENISON
Tex. Bar No. 05655560
Baab & Denison, LLP
6301 Gaston Ave., Suite 1320
Dallas, TX 75214
Tel.: (214) 637-0750

27

Fax.: (214) 637-0730
Email: denison@baabdenison.com

ERIKA A. DIEHL-GIBBONS*
Ohio Bar No. 86424
General Counsel
SHAWN M. MCKINLEY*
Associate General Counsel
Ohio Bar No. 95836
SMART-TD
6060 Rockside Woods Blvd. N, Ste. 325
Independence, OH 44131
Tel: (216) 228-9400
Email: ediehl@smart-union.org
Email: smckinley@smart-union.org

*Counsel for Defendant International
Association of Sheet Metal, Air, Rail and
Transportation Workers – Transportation
Division ("SMART-TD")*

\* Application for Admission
    Pro Hac Vice Forthcoming

**VERIFICATION**

I, Peter B. Trotta, certify under penalty of perjury that I am the Associate Chairperson with

SMART-TD General Committee of Adjustment GO-001, that I am familiar with the matters

stated in the foregoing Verified Counterclaim, and that the facts stated therein are true.

Executed on July 10th, 2026, in Nixa, MO.    _____
                                              Peter B. Trotta

28

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 10th day of July, 2026, a true and correct copy of the foregoing document was served on counsel for all parties of record listed below by a means permitted by Rule 5(b)(2) of the Federal Rules of Civil Procedure ("F.R.C.P.").

Aaron Samuels Markel
Jones Day - Detroit
150 West Jefferson Avenue
Suite 2100
Detroit, MI 48226
313-230-7929
Email: amarkel@jonesday.com
*Counsel for BNSF*

Koree B Wooley
Jones Day
4655 Executive Dr
Suite 1500
San Diego, CA 92121
858-314-1200
Email: kbwooley@jonesday.com
*Counsel for BNSF*

Russell D. Cawyer
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102-3194
Tele: 817-332-2500
Fax: 817-878-9280
Email: russell.cawyer@kellyhart.com
*Counsel for BNSF*

Joshua David McInerney
Wentz McInerney Peifer & Petroff, LLC
14 E Gay St, Fl 4
Columbus, OH 43215
614-756-5566
Email: jmcinerney@lawforlabor.com
*Counsel for BLET*

 */s/ Sanford R. Denison*
SANFORD R. DENISON

29